## Case No. 10,442.

### OELRICH et al. v. PITTSBURGH.

[1 Pittsb. Rep. 522; 6 Pittsb. Leg. J. 446; 7 Am. Law Reg. 725; 6 Pa. Law J. Rep. 485.]

Circuit Court, W. D. Pennsylvania. May 23, 1859.

MUNICIPAL CORPORATIONS — POWER TO ISSUE
BONDS IN AID OF RAILWAY—ASSIGN-
MENT OF COUPONS.

[1. A statute authorizing "any incorporated company, city or borough, to subscribe to the stock of the railroad as fully as any individual" (Act Pa. April 4, 1837), gives a municipal corporation no authority to issue bonds in payment of its subscription to such stock.]

[2. Under a statute authorizing a municipal corporation to subscribe to the stock of a railroad company, and to borrow money to pay therefor, and to make provision for the payment of principal and interest, but declaring that any certificates or bonds issued therefor "shall be transferable only on the books of the city" (Act Pa. April 21, 1852; Laws 1852, p. 418), interest coupons, which have been attached to the bonds, are not transferable, except in the same manner as the bonds themselves, and one suing upon the coupons cannot recover without showing a legal assignment of the bonds to him. His mere possession of the coupons creates no presumption that he is entitled to the interest.]

[3. Under a statute giving the city full authority to make the bonds and coupons transferable as shall be directed by the city corporation, the fact that the city has issued coupon bonds will raise the presumption that it authorized their issuance in that form by a proper ordinance, although no such ordinance is shown.]

[This was an action by Oelrich and others composing the firm of Oelrich & Co., against the mayor, aldermen, and citizens of Pittsburgh, to recover upon coupons of certain municipal bonds.]

GRIER, Circuit Justice (charging jury). The plaintiffs are a mercantile firm in Hamburg, and have instituted this suit against the mayor, aldermen, and citizens of Pittsburgh, a municipal corporation, chartered by acts of assembly of March 18, 1816 [6 Smith's Laws Pa. p. 357]. The claim set forth in the declaration is for 566 coupons, for interest due on certain bonds issued by the corporation under their seal and signed by the mayor and attested by the treasurer. These coupons are severed from the bonds, as their name shows was intended. Each is for six months' interest on a bond for $1,000, viz. $30. The

execution of them has been proved by the officer who signed them, and is not denied. The bonds to which they were originally attached were given to three several railroad corporations in payment of subscription of stock. The coupons differ (not materially perhaps) in their form, and will be noted hereafter. The declaration claims to recover 566 coupons of .$30 each. The plaintiffs have given in evidence but 539 of these; 403 are cut from bonds issued to the Allegheny Valley road, 102 from bonds given to the Pittsburgh & Steubensville road, and 34 to the Chartiers Valley Railroad.

Notwithstanding the many matters which have been introduced into the case, with so much apparent (and, I doubt not, real) earnestness, and no inconsiderable power of rhetorical declamation, the matters to be considered by the court and jury are, as in other cases, questions of law to be decided by the court, and questions of fact to be decided by the jury. The Magna Charta of England, the brave resistance by Hampden and Sidney to the illegal exactions of the crown, the resistance of the American colonies to the stamp act and tea tax, though appropriate in Fourth of July or other harangues, cannot be cited as cases in point to a court and jury, who are bound on their oaths to decide the case according to the laws of the state, as declared by your legislature and construed by your courts. We are here to decide according to the law as it is; not to deliberate what it ought to be. A true verdict, which you are sworn to render, must accord with the evidence before you and the law as expounded to you by the bench. Neither courts nor juries have sovereign or legislative powers to amend the laws where we consider them unwise or tyrannical,—productive only of corruption on one side, and individual hardship on the other.

When the demand for great public improvements by means of railroads and canals first commenced, no man doubted the power of the legislature of the state to make them, and to borrow money, contract loans, issue bonds, and lay taxes on the people to pay both interest and principal. Yet very many of the citizens were opposed to the exercise of this power, and protested that it was in fact mortgaging their property to make improvements whose benefits, if any, would be experienced by but a portion of the people. That this system of lavish borrowing and expenditure by state officials would be the source of much corruption and fraud, if not anticipated, might easily have been foreseen. It was pursued, nevertheless, till the state had accumulated a debt of forty millions, and ended only when she had lost her credit and could borrow no more. The great panic of 1842–43, which reduced the state, for a short time, to a state of temporary insolvency, put a sudden stop to this system of making public improvements by the government, at the expense of the people. The expenditure of such immense sums made flush times, and all were delighted with the system; yet, when they were past, and the hard times, with direct taxation to pay the interest, had arrived, no man thought of repudiating the debt because it was inconvenient to pay, or because some had opposed the system, and many were not benefited by it, or because people who lived out of the state had no opportunity to vote for or against it, or because each particular law had not been submitted to a direct vote of the people. When, therefore, credit was resuscitated, and money became plenty, seeking investment and subjects of speculation—when the mania for railroads again spread over the community—when it was anticipated that every railroad, from any place to another place, or no place, would produce large profits on the investment, would convert villages into cities, and make every city a London, and double and treble the value of land in every county through which they passed, the state being unwilling to involve herself in further debt, and risk a second insolvency, the scheme of city, county, and borough subscriptions was invented and put in practice. This had the appearance, if not the reality, of greater justice and fairness than the original plan of state subscriptions; for the distant counties and boroughs, whose people were not benefited by a particular road, were not compelled to pay for making it, and only those who partook of the expected benefit would have to pledge their credit for the cost of its erection. In this respect only, the scheme differed from the former; and when the legislature would no longer pledge the credit of the state for loans for this purpose, they authorized the inferior municipal corporations to pledge their own if they saw fit. They were presumed to be the best judges of what would contribute most to the prosperity of their respective constituents or corporations. The inhabitants of cities acted through their own councils or legislative representatives; the county, as a quasi corporate body, by their commissioners. These officers were elected directly by the people to attend to their interests; consequently the majority must govern. A minority must necessarily submit to laws enacted by the majority. If the officers elected by a majority had authority in the premises to make a contract, the minority cannot repudiate it. Those who opposed or refused their assent to the act may, with good conscience question its validity, and deny the power of the majority to bind them; but if the act be decided to be legal, they cannot refuse their submission. If they have the benefit of the constitution and laws for their protection, they must be governed by them as construed by their own courts selected for that purpose. The fact that the acts of their officers or legislators have been unwise, and instead of increasing the wealth of the people, have turned out disastrous, cannot be a reason for refusing their obedience to them. They are

their own acts, by imputation, whether they assented or not..

After these general remarks, let us proceed to examine the questions properly arising in the case. Had the corporate authorities of the city of Pittsburgh power to bind the people or corporators by the bonds or securities in question? On the solution of this question your verdict will depend; for I find no dispute about the material facts in evidence. As there are three several and distinct sets of bonds, issued to three corporations under different acts of assembly and ordinances of the corporation, it will be necessary to notice them separately; for it may be possible that the officers acted without authority in one or more, and not in all.

1. The first in order are the bonds issued to the Allegheny Valley Railroad. In support of this authority, we have been referred to the following acts of assembly: (1) The first act affecting this subject was passed April 4, 1837, entitled "An act for the incorporation of the Pittsburgh, Kittanning and Warren Railroad." Although thus named, none of these places are made necessary points in the road or termini thereof, for the company is authorized to make a road from the Allegheny river at the borough of Tarentum to the Ohio river at or near the borough of Beaver. This, however, is immaterial. The first section authorizes certain commissioners to open books and receive subscriptions to the capital stock, and when two thousand shares are subscribed, and four dollars paid on each share, they are to certify this fact to the governor, who is authorized thereon to issue letters patent, constituting the subscribers a body corporate, etc. By the second section of this act, it is enacted that "any incorporated company, city or borough, shall have authority to subscribe thereto, as fully as any individual." The 17th section requires the road to be commenced within five years, and finished within ten years; otherwise the charter shall be void. No charter ever issued, nor was any corporation constituted, under this act, within ten years. (2) But on the 16th of March, 1847, an act [Laws 1847, p. 443] was passed, called a supplement to the first, extending the time for commencing the construction of the road till the 1st day of June, 1852, and of completing it till the 1st of June, 1862. (3) A second supplement thereto was passed April 15, 1851, giving the said company (although no company was yet incorporated) authority to construct a road from Pittsburgh to Kittanning, and thence to the New York state line, and repealing so much of the first act as made Beaver and Franklin termini or points therein. (4) On the 10th of January, 1853, a charter of incorporation was issued by the governor to the "Pittsburgh, Kittanning and Warren Railroad Company." (5) On the 14th of April, 1852, a further supplement was passed [Laws 1852, p. 335], changing the name of the corporation to the "Allegheny Valley Railroad

Company," and making some other changes. Section 4 enacts that it shall be lawful for the counties and cities subscribing to the stock "to pay the amount of their subscription, if agreed upon by the parties, by the transfer of stocks held by them in other incorporated companies." (6) Section 6 enacts "that the several acts of the general assembly, limiting the amount of corporate debts of the cities of Pittsburgh and Allegheny, shall not prevent either of said cities from subscribing to the stock of said company."

Have we here any authority to the defendant to issue these bonds and the coupons annexed? This is a question of great magnitude and importance, and my sense of responsibility is somewhat relieved by the knowledge that any opinion I may hastily have formed may be hereafter reviewed by another tribunal; and as I have neither leisure nor opportunity in the haste of a trial at bar to defend by argument the conclusions to which I have arrived, I can but state them briefly, without attempting to vindicate their correctness. The municipal corporation of the city of Pittsburgh, though it acts through a special legislature elected by the citizens, is invested with special, not general, powers. It may pass ordinances in regard to its internal affairs to preserve the peace and the health of the citizens, to regulate the streets of the city, and, in fine, all other matters connected with it which come under the denomination of internal police, for the better government of the city. It may borrow money for the special purposes of the trust and authority confided to it, and lay taxes to raise money for these purposes. But it has no power, by virtue of its act of incorporation, to exercise any discretion in making ordinances for the construction of canals, turnpikes, or railroads, beyond the territorial limits of its jurisdiction. It cannot compel the citizens to become partners or stockholders in private corporations, or pledge or encumber the individual property of the citizens in speculative undertakings. Its powers are only coextensive with its duties. Hence the necessity of a special license from the legislature to a municipal corporation to subscribe for stock in such corporations. Whether the legislature of the state may confer upon the officers of such municipal corporations the power to bind the people of a city or county by bonds, and to burthen them with taxes to raise money for external objects, even of general public interest, or to compel them to become partners in any and every incorporated association, is a question on which much difference of opinion exists. In this state, however, this question has been decided by your own supreme court, the only expounders of your constitution and statutes. To their decision it is your duty to submit, without questioning its propriety.

Assuming, then, that the legislature has the constitutional power to authorize the officers of a municipal corporation to bind the cor-

porators by instruments such as those now declared on, with or without their individual consent, have they been conferred in clear and distinct terms? It is too important and dangerous a power to be assumed from inference or construction. "A statute may invest a corporation with powers contrary to the general rules of law, but they must be granted in clear and unambiguous terms. They must not be implied or presumed, and they must be exercised according to the strict interpretation of the grant. Wilcox, Corp. 26; Kirk v. Norvill, 1 Durn. & E. [1 Term R.] 124. The jurisdiction of a municipal corporation is local, its duties and its powers are local, and any power to act on subjects without must be conferred by the legislature in language which cannot be mistaken."

The second section of the act of April 4, 1837, which is supposed to authorize the execution of the bonds in question, authorizes "any incorporated company, city or borough to subscribe to the stock of the railroad as fully as any individual." It is a bare authority to subscribe for stock, or to become a stockholder in another corporation, as any individual might do. If the subscriber has money to invest in stocks, he may so invest it in this railroad stock. The law gives the municipal officers that permission and nothing more. It confers no authority to issue bonds with or without coupons, or to tax the property of the corporators to pay or lift the bonds, or pay the interest on them. The fourth section of the act of April 14, 1852, authorizes them to pay the amount of their subscription by transfer of other stocks held by them in other corporated companies; and the sixth section of the same act provides that the acts limiting the amount of corporate debts shall "not prevent either of said cities from subscribing" to the stock of the railroad. Here they are authorized to pay in stocks owned in other corporations, but not to contract debts or give bonds. And the release of a former disability cannot be construed to confer a power not before granted.

To support the plaintiff's case on this point, we must decide that the officers of the corporation have an unlimited power to subscribe the whole stock to build the road, say five to ten millions of dollars; and not only so, but to issue bonds binding the corporators to pay principal and interest, and to lay taxes on their property for that purpose,—in other words, to mortgage the whole income of the people of Pittsburgh. The court must instruct you that such an erroneous and irresponsible power as is here claimed is not to be found, either in direct terms or by any legitimate inferences, in the acts of assembly in question. The power is to the full extent I have stated, or it does not exist at all. You are therefore instructed that the officers of the corporation (defendant) had no authority whatever to issue the bonds and coupons declared upon and now produced. This disposes of the case as far as regards the 403 coupons on the bonds issued to the Allegheny Valley Railroad.

2. Let us now examine the authority to issue the bonds to the Pittsburgh & Steubenville Railroad Company. These are issued under two several acts of assembly, which we will examine separately: (1) The first issue is by virtue of the authority conferred by the 3d section of the act of April 21, 1852, which is as follows: (The court here read from the act as set forth on pamphlet, p. 227.) Here we have a direct authority given not only to subscribe for 5,000 shares of the stock of the railroad company, but also to borrow money to pay therefor, and make provision for the principal and interest of the money so borrowed. But it is also enacted that "no certificate of loans or bonds shall be for a less sum than $100, and shall be transferable only on the books of the city." Are these bonds and coupons within the authority thus conferred? (Bond read.) The bonds do not set forth how they are to be transferred, but refer to this act which authorizes their issue. This suit is on the coupons provided for in the bond. The coupons are not directly authorized, but the covenant of the bond is to pay to the railroad company and their assigns. On the back of the bond is endorsed a blank power of attorney to make an assignment on the books; but no assignment has been made. The interest is but an incident to the debt; and unless the plaintiff had the bond assigned to him according to the act, he has no right to demand the interest. There is no covenant to pay to the holder or bearer of the bond, and the interest is due only to the legal holder by assignment, and cannot be made payable to a third person. The act gives no authority to the city officers to make such negotiable instruments having a different mode of transfer from the bonds to which they were attached. Where a bond is payable to bearer, the bearer of the coupons shows a prima facie title to have the interest, because he was owner or holder of the bond when he cut it off. But where no one can show a legal title to the bond but an assignee of the bond, there can be no presumption that he is entitled to the interest by mere possession of a coupon. The plaintiff cannot therefore recover, on the evidence, on any of the coupons taken from bonds of the first issue. (2) As to the second issue: The act is defined, "Act of May 8, 1854" [Laws 1854, p. 709]. (Act read to the jury.) This act does not restrict the bond to assignees on the books of the city, and provides for and authorized the issue of coupons.

3. Lastly, the Chartiers Valley Railroad: (Act Feb. 7, 1853 [Laws 1853, p. 43], § 6, read.) Here is full authority to make the bonds and coupons transferable as shall be directed by the city corporation. There is no city ordinance shown directing that the bonds shall be coupon bonds, but the corporation has issued them in that form; it will be presumed that it was so directed by them. I see no

reason why the plaintiff should not recover on these coupons on the evidence in the case, if believed by the jury.

Thirty-six points or prayers for instruction have been presented by plaintiffs' counsel. The first ten are refused. The eleventh has been given on the charge. Twelfth: It matters not who paid the treasurer for his trouble; the rest of the point is answered in the affirmative. Thirteenth is refused, as also the fourteenth, except as already given. Fifteenth refused. Sixteenth refused; the act authorized the issue of coupons. Seventeenth is given as prayed. Eighteenth is refused. Nineteenth refused. Twentieth refused. Twenty-first refused. Twenty-second refused. Twenty-third has been given; makes twenty-fourth, twenty-fifth, twenty-sixth, and twenty-seventh unnecessary and superfluous. Twenty-eighth has been given. Twenty-ninth, thirtieth, thirty-first, thirty-second, and thirty-third refused. Thirty-fourth refused, the evidence proving the contrary. Thirty-fifth refused under the evidence. Thirty-sixth refused. The plaintiffs have a right to interest on the coupons which the jury shall find to have been legally issued under the previous instructions, with interest from day of payment.

[NOTE. Plaintiffs subsequently sued out a writ of fi. fa., and levied on 656 shares of the capital stock of the Pittsburgh Gas Company, held in the names of the defendants on the books of the corporation. An application to set aside the execution and the levy was refused. Case No. 10,444.]